10-0722-cv (L)
Mayor and City Council of Baltimore, Maryland et al., v. Citigroup, Inc., et al.,

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2010

(Argued: April 13,  2011                    Decided: March 5, 2013)

Docket Nos. 10-0722-cv (L), 10-0867-cv (CON)

_____

MAYOR AND CITY COUNCIL OF BALTIMORE, MARYLAND, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, RUSSELL MAYFIELD, INDIVIDUALLY AND ON BEHALF OF HIMSELF AND OF ALL OTHERS SIMILARLY SITUATED, PAUL WALTON, INDIVIDUALLY AND ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, JOHN ABBOTT, INDIVIDUALLY AND ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellants*,

— v.—

CITIGROUP, INC., CITIGROUP GLOBAL MARKETS, INC., UBS AG, UBS SECURITIES LLC, UBS FINANCIAL SERVICES, INC., MERRILL LYNCH & COMPANY, INC., MORGAN STANLEY, LEHMAN BROTHERS HOLDINGS, INC., BANK OF AMERICA CORPORATION, WACHOVIA CORPORATION, WACHOVIA SECURITIES, LLC, WACHOVIA CAPITAL MARKETS, LLC, THE GOLDMAN SACHS GROUP, INC., JP MORGAN CHASE & COMPANY, ROYAL BANK OF CANADA, DEUTSCHE BANK, AG,

*Defendants-Appellees*.[*]

_____

Before:

LEVAL, KATZMANN, and HALL, *Circuit Judges*.

_____

_____

[*]  The Clerk of the Court is directed to amend the caption as set forth above.

This case is one of many arising out of the collapse of the market for auction rate securities in early 2008. Plaintiffs in this consolidated action seek relief on behalf of two large putative classes—one whose members bought auction rate securities and one whose members issued them. Defendants, who rank among the world's largest and best-known financial institutions, are alleged to have triggered the market's collapse by conspiring with each other to simultaneously stop buying auction rate securities for their own proprietary accounts. According to Plaintiffs, the effect of this agreement was a "boycott" or "refusal to deal" in violation of the Sherman Act, 15 U.S.C. § 1. The United States District Court for the Southern District of New York (Jones, *J.*) held that the conduct alleged by Plaintiffs was impliedly immunized from antitrust scrutiny by the securities laws, and dismissed Plaintiffs' complaints pursuant to Fed. R. Civ. P. 12(b)(6). *Mayor of Balt. v. Citigroup, Inc.*, No: 08-cv.-7746-47 (BSJ), 2010 U.S. Dist. LEXIS 13193 (S.D.N.Y. Jan. 26, 2010). Plaintiffs appeal.

Even construed liberally, Plaintiffs' complaints do not successfully allege a violation of Section 1 of the Sherman Act. Although we do not reach the district court's implied-repeal analysis under *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007), the court was ultimately correct that the complaints fail to state a claim upon which relief can be granted. The judgment of the district court is therefore affirmed.

AFFIRMED.

---

ALLAN STEYER, Steyer Lowenthal Boodrookas Alvarez & Smith LLP, San Francisco, CA (Henry A. Cirillo, Lisa Marie Black, Steyer Lowenthal Boodrookas Alvarez & Smith LLP, San Francisco, CA; Michael D. Hausfeld, Steig D. Olson, Michael P. Lehmann, Jon T. King, Hausfeld LLP, New York, NY; and Arun S. Subramanian, Susman Godfrey LLP, New York, NY, *for Plaintiffs-Appellants Mayor and City Council of*

2

*Baltimore, Maryland, on behalf of themselves and all others similarly situated, on the brief), for Plaintiffs-Appellants Russell Mayfield, Paul Walton, and John Abbot, individually and on behalf of themselves and all others similarly situated.*

JONATHAN K. YOUNGWOOD, Simpson Thacher & Bartlett LLP, New York, NY (Thomas C. Rice and Hillary C. Mintz, Simpson Thacher & Bartlett LLP, New York, NY; Brad S. Karp, Charles E. Davidow, Kenneth A. Gallo and Andrew C. Finch, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *for Defendants-Appellees Citigroup Inc. and Citigroup Global Markets, Inc.*; Donald W. Hawthorne, Benjamin Sirota and William Weeks, Debevoise & Plimpton LLP, New York, NY, *for Defendants-Appellees UBS AG, UBS Securities LLC and UBS Financial Services, Inc.*; Jay B. Kasner, Paul M. Eckles and Shepard Goldfein, Skadden, Arps, Slate, Meagher, & Flom LLP, New York, NY, *for Defendant-Appellee Merrill Lynch & Co., Inc.*; Bradley J. Butwin, Jonathan Rosenberg and Andrew Frackman, O'Melveny & Myers LLP, New York, NY, *for Defendant-Appellee Bank of America Corporation*; Gregory A. Markel and Ronit Setton, Cadwalader, Wickersham & Taft LLP, New York, NY, *for Defendant-Appellee Morgan Stanley*; Arthur S. Greenspan and Jon Connolly, Richards Kibbe & Orbe LLP, New York, NY, *for Defendants-Appellees Wachovia Corporation, Wachovia Securities, LLC and Wachovia Capital Markets, LLC*; David H. Braff, David M.J. Rein and William H. Wagener, Sullivan & Cromwell LLP, *for Defendant-Appellee The Goldman Sachs Group, Inc.*; Sean M. Murphy, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, *for Defendant-Appellee Royal Bank of Canada*; and Stephen L. Saxl and Toby S. Soli, Greenberg Traurig, LLP, New York, NY, *for Defendant-Appellee Deutsche Bank AG, on the brief) for Defendant-Appellee JP Morgan Chase & Co.*

————————————————

Hall, *Circuit Judge*:

This case is one of many arising out of the collapse of the market for auction rate

securities in early 2008. Plaintiffs in this consolidated action seek relief on behalf of two large

putative classes—one whose members bought auction rate securities and one whose members

issued them. Defendants, who rank among the world's largest and best-known financial

institutions, are alleged to have triggered the market's collapse by conspiring with each other to

3

simultaneously stop buying auction rate securities for their own proprietary accounts. According to Plaintiffs, the effect of this agreement was a "boycott" or "refusal to deal" in violation Section 1 of the Sherman Act, 15 U.S.C. § 1 (2006). The United States District Court for the Southern District of New York (Jones, *J.*) held that the conduct alleged by Plaintiffs was impliedly immunized from antitrust scrutiny by the securities laws and dismissed Plaintiffs' complaints pursuant to Federal Rule of Civil Procedure 12(b)(6). *Mayor of Balt. v. Citigroup, Inc.*, No: 08-cv.-7746-47 (BSJ), 2010 U.S. Dist. LEXIS 13193 (S.D.N.Y. Jan. 26, 2010). Plaintiffs appeal.

Construed liberally and with all factual assertions accepted as true, Plaintiffs' complaints do not successfully allege a violation of Section 1 of the Sherman Act. Although we do not reach the district court's implied-repeal analysis under *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007), the court was ultimately correct that the complaints fail to state a claim upon which relief can be granted. The judgment of the district court is therefore AFFIRMED.

## Background

Auction rate securities ("ARS") were[1] usually long-term bonds with flexible interest rates that reset periodically through "Dutch" auctions.[2] Popular among investors because of their perceived cash-like liquidity and relatively high rates of return, ARS were issued in increasing numbers throughout the 1990s and 2000s. By February 2008, there was an estimated $330 billion (par value) in unmatured ARS outstanding.

---

[1] We use the past tense because the ARS market essentially collapsed in 2008.

[2] A minority of ARS were preferred stock with a variable dividend yield. For simplicity, however, we refer to the income stream flowing from a generic auction rate security as its "interest rate."

4

Unlike traditional stocks and bonds, which can be sold for cash at any time on one of numerous exchanges, ARS were typically traded at dedicated auctions. During the time they were viable, these auctions were held regularly pursuant to a given issuance's offering documents, usually every seven, twenty-eight, or thirty-five days. The ARS would be auctioned for par value, but their interest rates would reset depending on demand at the auction. The process worked roughly as follows. Investors would submit one of four types of orders. Those who wanted to buy ARS would make a "bid" order, stating how many securities they would like to buy and at what minimum interest rate. Generally, no bids of less than $25,000 were allowed. Those who already owned ARS could submit a "sell" order, instructing that their shares be sold regardless of the level at which the interest rate would reset; they could enter a "hold" order (the default order) and keep their shares; or they could make a "hold-at-rate" order, directing that their shares be sold only if the ARS would otherwise reset below a certain interest rate—a sign of high demand. The auction manager, usually the same broker-dealer that had originally underwritten a particular offering, would start filling orders from the bid with the lowest minimum interest rate and work up, bringing more and more bids into play. Eventually, assuming demand for the ARS exceeded supply, every sell order would be filled and the auction would "clear." The interest rates of all ARS subject to that auction would then reset to that rate at which the last order was filled, known as the "clearing rate." Obviously, the higher the demand at a particular auction, the more the ARS interest rate would be pushed down.

ARS, however, had a problem—a strong secondary market for ARS apparently never developed. Without auctions, ARS were relatively illiquid assets which usually could not be sold for par value. Auctions would clear only if demand for ARS (the bid orders and applicable

5

hold-at-rate orders) matched or exceeded the supply of ARS being sold.  If, at a given auction, more people wanted to sell an auction rate security than wanted to buy it, the auction was said to have "failed."  Following an auction failure, no ARS would change hands, and would-be sellers were forced to retain ownership of their securities.  At the same time, an auction failure automatically triggered a rate default and the interest rate would rise to a "penalty" or "maximum" rate set out in the ARS offering documents.

For many years, the auction process appeared to work smoothly, rarely resulting in failure.  ARS earned a reputation as safe liquid instruments and as an attractive alternative to normally low-risk, low-return money market funds.

The market, however, was less stable than it seemed.  In 2006, the SEC issued a cease-and-desist order to fifteen broker-dealers, finding that some of them had, without properly disclosing their activities, intervened in the auction process to prevent auction failures and set clearing rates.  *In re Bear, Stearns & Co. Inc*., Securities Act Release No. 8684, Exchange Act Release No. 53888, 88 SEC Docket 259 (May 31, 2006).  As the auctions' managers, these broker-dealers could learn ahead of time if failure was imminent.  *Id.*  They then used proprietary trading accounts to place "support bids," thereby absorbing the auctions' excess supply into their own inventory and preventing auction failure.  *Id.*  The respondents in the SEC's administrative proceeding—some of whom are defendants in this action—agreed to pay civil fines to the Commission and to disclose to their customers their "material auction practices and procedures." *Id.*  They did not agree (nor were they ordered) to stop placing support bids in auctions that they managed.

6

These support bids appear to have become increasingly important to the auctions' success as financial market conditions deteriorated throughout 2007 and early 2008. Some ARS offerings directly financed subprime mortgage lending and many others were insured by entities that were linked to such lending. As the housing market slipped into crisis, investors sought to extricate themselves from related positions. Yet, with the exception of a few isolated failures in late 2007, the auctions continued to clear as normal.

All of this changed when many of the auctions held on February 12, 2008, failed. The next day, 87 percent of scheduled auctions failed. By Valentine's Day, the ARS market had essentially ceased functioning, and has never recovered.

In September 2008, Plaintiffs filed two nearly identical class-action complaints, asserting that broker-dealers Citigroup, Inc., UBS AG, Merrill Lynch & Co, Inc., Morgan Stanley, Lehman Brothers Holdings, Inc., Bank of America Corp., Wachovia Corp., Goldman Sachs, JP Morgan Chase & Co., Royal Bank of Canada, Deutsche Bank AG and various entities affiliated with them (collectively "Defendants") conspired to restrain trade by simultaneously refusing to support the ARS auctions they managed. One complaint was filed on behalf of a putative nation-wide class of ARS investors; the other, on behalf of a class of ARS issuers.

According to Plaintiffs, Defendants frequently saved the auctions they managed from failing by placing large numbers of support bids. (Pls' Compl. ¶ 61.)[3] Indeed, Plaintiffs allege that Defendants conspired among themselves to do so. (*See, e.g.*, *id.* at ¶¶ 59, 70.) Plaintiffs theorize that the failure of any one defendant's auction would damage the image of ARS as a

_____

[3] Given the substantively identical nature of the two complaints, citations are to the investor complaint alone.

7

whole, and assert that Defendants banded together to prevent such failures from occurring. (*Id.* at ¶ 66.) Defendants earned high fees underwriting ARS, and Plaintiffs claim that lucrative business would have dried up if issuers realized how little demand there actually was for their offerings. (*Id.* at ¶¶ 63, 66.) Plaintiffs allege that Defendants agreed to manufacture demand by jointly propping up the auctions with support bids, keeping the fees flowing, and avoiding the loss of goodwill that auction failures would inevitably provoke.[4] (*Id.* at ¶ 66.)

Plaintiffs further allege that the practice of placing support bids greatly intensified—and Defendants consequently took on more inventory—as demand for ARS declined throughout the fall and winter of 2007. (*Id.* at ¶¶ 80, 81.) As the situation worsened, some of the Defendants placed internal limits on ARS inventory. (*Id.* at ¶ 82.) According to Plaintiffs, Defendants nevertheless continued to market the securities aggressively to investors. (*Id.* at ¶ 88.) Plaintiffs claim Defendants, after accumulating such increased inventory through support bids, were anxious to move as much of it off of their books as possible. (*Id.* at ¶¶ 80, 84, 92.) At a certain point, however, the opportunity to sell these potentially toxic assets was outweighed by the real-world cost of placing ever larger support bids, and Defendants realized that they would eventually need to withdraw support from the auctions. (*Id.* at ¶ 90.) According to Plaintiffs, Defendants determined, for reasons not explained in the complaints, that a collective moratorium on support bids would be the best way to achieve this goal. (*Id.* at ¶ 90.) Thus, on February 13,

---

[4] Plaintiffs assert that such coordination was possible because, "[t]he auction rate securities market was highly concentrated, with regulatory and financial barriers that discouraged entry and the competition that entry could bring." (*Id.* ¶ 62.) To support this claim, Plaintiffs offer market share numbers for ARS underwriting, showing that relatively few firms—all defendants here—underwrote the majority of ARS offerings. (*Id.*)

2008, "all of the major broker-dealers concertedly refused to continue to support the auctions" and billions of dollars of outstanding ARS became illiquid, causing injury to investors and issuers alike. (*Id.* at ¶¶ 94, 95.)

Plaintiffs describe this agreed-upon conduct alternatively as a concerted "refusal to deal" and as a "boycott." (*Id.* at ¶¶ 8, 112.) Although the complaints also contain allegations that Defendants illicitly conspired to prop up the auctions in the first place, thereby fixing the prices of ARS offerings, (*id.* at ¶ 112), Plaintiffs have since abandoned this aspect of their suit. They now assert that "the antitrust violation alleged in the Complaints is confined to the broker-dealers' collusion to simultaneously exit the ARS market." (Pls' Br. 7 n.3.)

Defendants made a single motion to dismiss both complaints pursuant to, *inter alia*, Fed. R. Civ. P. 12(b)(6). The district court granted the motion, holding that Plaintiffs' antitrust claim was impliedly precluded by federal securities law. *Mayor of Balt.*, 2010 U.S. Dist. LEXIS 13193, at *14. It believed *Billing*, 551 U.S. at 264, was controlling and analyzed Plaintiffs' claim according to *Billing*'s four factors. *Mayor of Balt.* at *14-*24. Finding that each factor weighed in favor of preclusion, the district court agreed with Defendants that "the SEC's continuing regulation of ARS is 'clearly incompatible' with the antitrust laws" and dismissed the complaints. *Id.* at *14, *24. Plaintiffs argue on appeal that their Sherman Act claim is not precluded by the securities laws.

**Discussion**

We review *de novo* a district court's dismissal of a complaint under Rule 12(b)(6). *Novak v. Kasaks*, 216 F.3d 300, 305 (2d Cir. 2000). We conclude there was no need for the district court to determine whether Plaintiffs' claim was precluded by the securities laws,

9

because Plaintiffs do not allege a plausible conspiracy to violate Section 1 of the Sherman Act in the first instance. Thus, there was no antitrust claim to be impliedly precluded. We therefore affirm the judgment of the district court because Plaintiffs' complaints do not state a claim for relief.[5] *See Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 49 (2d Cir. 2010) ("We may affirm the district court's decision on any ground appearing in the record.").

When reviewing a district court's dismissal of a complaint for failure to state a claim under Rule 12(b)(6), we accept all factual allegations as true and draw every reasonable inference from those facts in the plaintiff's favor. *See Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999). Yet "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alterations, and internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* To survive dismissal, a complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. This standard "does not impose a *probability* requirement at the pleading stage; it simply calls for enough fact to raise a reasonable *expectation* that discovery will reveal evidence of illegal [conduct]." *Id.* at 556 (emphasis added). Importantly, the "plausibility" standard applies only to a complaint's *factual* allegations. We give no effect at all to "legal conclusions couched as

---

[5]Accordingly, we express no view of the district court's resolution of the *Billing* question, as it is unnecessary to our disposition.

factual allegations." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007).

The Sherman Act bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "The crucial question in a Section 1 case is therefore whether the challenged conduct 'stems from independent decision or from an agreement, tacit or express.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)) (alteration omitted).

The ultimate existence of an "agreement" under antitrust law, however, is a legal conclusion, not a factual allegation. *See Starr*, 592 F.3d at 319 n.2 ("The allegation that defendants agreed to [a] price floor is obviously conclusory, and is not accepted as true."). A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed. As *Starr* suggests, there are two ways to do this. First, a plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323-24 (3d Cir. 2010) ("Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate" under *Twombly*). Such evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level.

But, in many antitrust cases, this type of "smoking gun" can be hard to come by, especially at the pleading stage. Thus a complaint may, alternatively, present circumstantial facts supporting the *inference* that a conspiracy existed. "[E]ven in the absence of direct

11

'smoking gun' evidence," a horizontal agreement, such as the one alleged in the case before us, "may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001); *see also Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253-54 (2d Cir. 1987) ("[A] plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy."). "These 'plus factors' may include:  a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications."[6] *Twombly v. Bell Atl. Corp.,* 425 F.3d 99, 114 (2d Cir. 2005), *rev'd on other grounds*, *Twombly*, 550 U.S. 544.

Generally, however, alleging parallel conduct alone is insufficient, even at the pleading stage.  This is *Twombly*'s contribution.  The plaintiffs in that case alleged that defendant telephone companies had "entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and ha[d] agreed not to compete with one another and otherwise allocated customers and markets to one another."  550 U.S. at 551.  This "wholly conclusory statement of claim," however, was deemed a legal conclusion, not a factual allegation.  *See id.* at 561, 564 n.9; *see also id.* at 556-57 ("Without more, . . . a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").  The plaintiffs did not "rest their § 1

_____

[6] As our use of the broad term "may include" suggests, these plus factors are neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement.

12

claim . . . on any independent allegation of actual agreement." *Id.* at 564. And all they alleged as circumstantial facts were parallel actions by the competitors. *Id.* at 564-65. The *Twombly* Court held this was not enough "to render a § 1 conspiracy plausible." *Id.* at 553, 556.

At base, the Court's concern was that merely observing parallel conduct among competitors does not necessarily explain its cause. In a competitive industry, "[p]arallel conduct is, of course, consistent with the existence of an agreement; in many cases where an agreement exists, parallel conduct—such as setting prices at the same level—is precisely the concerted action that is the conspiracy's object." *Ins. Brokerage*, 618 F.3d at 321. But if parallel conduct or interdependence is "consistent with conspiracy," it is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554. If we permit antitrust plaintiffs to overcome a motion to dismiss simply by alleging parallel conduct, we risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy. *Id.* at 558. *See also id.* (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)) ("The costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." (alterations omitted)). Consequently, parallel conduct allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Examples of parallel conduct allegations that might be sufficient under *Twombly*'s standard include "parallel behavior that would probably not result from chance,

13

coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," and "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Id.* at 556 n.4 (internal quotation marks omitted).

Thus *Twombly* provides us with two clear guidelines. First, a bare allegation of parallel conduct is not enough to survive a motion to dismiss. Something more must be alleged. *See Ins. Brokerage*, 618 F.3d at 323 ("A corollary of [*Twombly*] is that plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one 'plus factor,' since plus factors are, by definition, facts that tend to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors." (internal quotation marks omitted)). Second, even if a plaintiff alleges additional facts or circumstances—what we have previously called "plus factors"—these facts must still lead to an inference of conspiracy. *Starr*, 592 F.3d at 322. "[S]uch factors in a particular case could lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987).

In *Starr*, for example, the plaintiffs alleged *inter alia* that defendant music distributors agreed to restrict the availability of music on the internet by fixing prices at artificially high levels and by imposing onerous terms of use on sub-distributor licensees and customers. *Starr*, 592 F.3d at 318-19. Unlike in *Twombly*, the complaint made numerous very specific allegations about the nature of the defendants' parallel conduct. *See id*. at 323. But more importantly, the complaint was replete with allegations of "plus factor" facts that "place[d] the parallel conduct in

14

a context that raise[d] a suggestion of a preceding agreement." *Id.* First, the defendants controlled more than eighty percent of the relevant market. *Id.* Second, at least one industry commentator noted that "nobody in their right mind" would use defendants' music services, "suggesting that some form of agreement among defendants would have been needed to render the enterprises profitable." *Id.* at 324. Third, one defendant's CEO strongly implied that the company had acted to stop the "continuing devaluation of music." *Id.* Fourth, the defendants affirmatively tried to structure parts of their business to avoid antitrust scrutiny. *Id.* Fifth, defendants charged a price well above that charged by non-defendant competitors. *Id.* Sixth, the defendants' activities were under antitrust investigation by various governmental agencies. *Id.* Seventh, defendants raised prices, simultaneously, at a time when their costs were declining. *Id.*

In this case, by contrast, Plaintiffs have essentially pleaded only parallel conduct, with little more. Although at one time they asserted a broader set of violations, Plaintiffs have narrowed their claims, now asserting that Defendants violated the antitrust laws only by withdrawing from the ARS market "in a virtually simultaneous manner" on February 13, 2008. Compl. ¶ 8. That is the only relevant parallel conduct they allege.[7] And the few additional facts they do assert fail plausibly to suggest that this parallel conduct flowed from a preceding agreement rather than from their own business priorities.

Indeed, Defendants' alleged actions—their *en masse* flight from a collapsing market in which they had significant downside exposure—made perfect business sense. *Compare Starr*,

---

[7] Although they mention other actions taken by some or all of the defendants, for example placing support bids to prevent auction failures and "fail[ing] to disclose and misrepresent[ing] the true nature of ARS to investors," Plaintiffs say these facts are merely included for context. Appellant's Br. at 7 n.3

15

592 F.3d at 327 (complaint survived motion to dismiss because "plaintiffs have alleged behavior that would plausibly *contravene* each defendant's self-interest in the absence of similar behavior by rivals" (emphasis added)). In their brief on appeal, with its repeated mention of the February 13 auction failures, Plaintiffs seem to be suggesting that the ARS market had been healthy until that day and imploded in a sudden and unexpected collapse. But the allegations in their complaints reveal otherwise. Indeed, according to Plaintiffs themselves, ARS auctions started failing as early as the summer of 2007. Compl. ¶ 80. More auctions failed during the fall and winter, putting Defendants on notice that "the market for [ARS] was in danger of failing." Compl. ¶ 81. Thus by early 2008, each defendant was faced with the same dilemma. Continuing to prop up the auctions with support bids generated commissions for successful auctions; but if enough auctions failed, ARS would be seen as poor investments, the markets would dry up, and Defendants' support purchases would turn into major liabilities. As the complaints vividly demonstrate, each defendant was well aware of these dynamics—the market as a whole was essentially holding its breath waiting for the inevitable death spiral of ARS auctions. In such an environment it is unsurprising, and expected, that once failures reached a critical mass, defendants would exit the market very quickly. In fact, at that point abandoning bad investments was not just *a* rational business decision, but the *only* rational business decision.

Similarly, Plaintiffs' factual allegations do not plausibly suggest a "common motive to conspire." *See Apex Oil*, 822 F.2d at 254 (identifying common motive as a possible "plus factor"). Although Plaintiffs offer numerous motive allegations, they relate almost exclusively to Defendants' joint motivation to conspire to *support* the market. Plaintiffs assert, for example, that "[j]oint action by Defendants [in placing support bids] was required in order to supply

16

sufficient buyers in any given auction to prevent that auction from failing and to support the market." Compl. ¶ 65. That has no bearing on their motivation to *exit* the market, which is the alleged antitrust violation. And to the extent Plaintiffs' complaints can be read to assert a common motive to exit, perhaps in order to cut losses, such facts are insufficient to support the inference of conspiracy. Plaintiffs allege that the ARS market was "highly concentrated, with regulatory and financial barriers that discouraged entry." Compl. ¶ 61. For instance, more than 90% of one market segment was dominated by just three defendants, according to the complaints. As our sister circuit has helpfully explained, "evidence that the defendant had a motive to enter into a[n antitrust] conspiracy . . . may indicate simply that the defendants operate in an oligopolistic market, that is, may simply restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism." *Ins. Brokerage*, 618 F.3d at 322. That is exactly the situation here. Even reading the complaints in the light most favorable to Plaintiffs, as we must, these asserted facts lead to only one plausible inference: these are "actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement." *See Apex Oil*, 822 F.2d at 254.

Plaintiffs also claim to offer "specific communications between the Defendants." Reply Br. at 11, *cf. Apex Oil*, 822 F.2d at 254 ("a high level of interfirm communications" is a potential "plus factor" allowing a fact-finder to infer a conspiracy). Their complaints, however, allege only two actual communications *between* competitors: (1) UBS's Chief Risk Officer's January 9, 2008, e-mail referring to "discussions with citi" about the student loan segment of the ARS market, Compl ¶ 91, and (2) a UBS executive's February 9, 2008, e-mail relating a conversation he had with a Citigroup employee about Citigroup's and Merrill Lynch's problems and potential

17

moves in the ARS market. *Id*. All the other "communications" detailed in the complaints are *internal* to individual defendants. For example, on January 23, 2008, a Merrill Lynch executive told his superior that a "new crisis [is] brewing on the auction side" at Lehman Brothers and that "[w]e've had 3 parties confirm that Lehman is dropping out of the auction business." Compl. ¶ 89. On February 12, 2008, a UBS executive noted that "our peers are working feverishly to restructure" their ARS business and that UBS needed to follow suit. Compl. ¶ 91. Even reading the complaints in the light most favorable to the Plaintiffs, these statements do not provide any evidence of *interfirm* communications. In fact, they tend to suggest the *absence* of such communications—if, for example, Merrill Lynch and Lehman were talking, the former would not have had to rely on third parties to confirm the latter's strategy. At most, these conversations suggest a high level of interfirm *awareness*. Such "conscious parallelism," however, is not unlawful in itself. *Twombly,* 550 U.S. at 554. It is instead "a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions." *Id.* at 553-54. The only allegations that tend to assert something more than "conscious parallelism" are the two vague references to isolated discussions among only three defendants. Those simply are not enough plausibly to allege a "high level" of interfirm communications.

Although *Twombly*'s holding rests on numerous justifications, at bottom its prime concern, like all cases interpreting Rule 12(b)(6), is isolating those cases that assert a plausible antitrust conspiracy (and thus warrant discovery to determine whether, in fact, such a conspiracy exists) from those that merely presume a conspiracy from parallel action. Plaintiffs' complaints are without question of the latter variety. None of their allegations are sufficient to "raise a

18

reasonable expectation that discovery will reveal evidence of illegality." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citing *Twombly*, 550 U.S. at 556) (quotation marks and alterations omitted). Their cases must be dismissed.

## Conclusion

Because Plaintiffs do not allege a violation of the Sherman Act or otherwise state a claim upon which relief can be granted, the judgment of the district court dismissing their complaints under Fed. R. Civ. P. 12(b)(6) is **AFFIRMED.**