24-135-cv
*Tera Group, Inc. et al. v. Citigroup, Inc. et al.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 16ᵗʰ day of October, two thousand twenty-four.

PRESENT:
> JOSEPH F. BIANCO,
> STEVEN J. MENASHI,
> EUNICE C. LEE,
> > *Circuit Judges.*

_____

TERA GROUP, INC., TERA ADVANCED TECHNOLOGIES, LLC, TERAEXCHANGE, LLC,

> *Plaintiffs-Appellants*,

> v.                                                                                    24-135-cv

CITIGROUP, INC., CITIBANK, N.A., CITIGROUP GLOBAL MARKETS INC., CITIGROUP GLOBAL MARKETS LIMITED, BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., BNP PARIBAS, BNP PARIBAS SECURITIES CORP., CREDIT SUISSE AG, CREDIT SUISSE GROUP AG, CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE INTERNATIONAL, JPMORGAN CHASE & CO., JPMORGAN CHASE, N.A., J.P. MORGAN SECURITIES LLC, JP MORGAN SECURITIES PLC, UBS SECURITIES LLC,

*Defendants-Appellees*,

BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., GOLDMAN SACHS GROUP, INC., GOLDMAN SACHS & CO., GOLDMAN SACHS BANK USA, GOLDMAN SACHS FINANCIAL MARKETS, L.P., GOLDMAN SACHS INTERNATIONAL, HSBC HOLDINGS PLC, HSBC BANK PLC, HSBC BANK USA, N.A., HSBC SECURITIES (USA) INC., MORGAN STANLEY, MORGAN STANLEY BANK, N.A., MORGAN STANLEY & CO. LLC, MORGAN STANLEY CAPITAL SERVICES LLC, MORGAN STANLEY DERIVATIVE PRODUCTS INC., ROYAL BANK OF SCOTLAND PLC, RBS SECURITIES INC., MORGAN STANLEY BANK INTERNATIONAL LIMITED,

*Defendants.*∗

---

| | |
|---|---|
| FOR PLAINTIFFS-APPELLANTS: | JASON H. KIM, Schneider Wallace Cottrell Konecky LLP, Los Angeles, California. |
| FOR DEFENDANTS-APPELLEES: | ROBERT D. WICK (John S. Playforth and Carol S. Weiland, *on the brief*), Covington & Burling LLP, Washington, District of Columbia, *for* JPMorgan Chase & Co., JPMorgan Chase, N.A., J.P. Morgan Securities LLC, and JP Morgan Securities PLC. |
| | Brad S. Karp, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York; Kenneth A. Gallo and Robert J. Gonzalez, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, District of Columbia, *for* Citigroup Inc., Citibank, N.A., Citigroup Global Markets Inc., and Citigroup Global Markets Limited. |

---

∗ The Clerk of the Court is respectfully directed to amend the caption on this Court's docket to be consistent with the caption on this order.

Peter G. Wilson, Katten Muchin Rosenman LLP, Chicago, Illinois, *for* UBS Securities LLC.

James E. Brandt and Lawrence E. Buterman, Latham & Watkins LLP, New York, New York, *for* Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc.

Arman Oruc, Goodwin Procter LLP, Washington, District of Columbia; Christine V. Sama, Goodwin Procter LLP, New York, New York, *for* BNP Paribas and BNP Paribas Securities Corp.

David G. Januszewski, Herbert S. Washer, and Jason M. Hall, Cahill Gordon & Reindel LLP, New York, New York, *for* Credit Suisse AG, Credit Suisse Group AG, Credit Suisse Securities (USA) LLC, and Credit Suisse International.

Appeal from a judgment of the United States District Court for the Southern District of New York (Richard J. Sullivan, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court, entered on August 14, 2023, is **AFFIRMED**.

Plaintiffs-Appellants Tera Group, Inc., Tera Advanced Technologies, LLC, and TeraExchange, LLC (collectively, "Tera") appeal from the district court's dismissal of their antitrust claims, brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq*., against Defendants-Appellees Citigroup, Inc., Citibank, N.A., Citigroup Global Markets Inc., and Citigroup Global Markets Limited (collectively, "Citi"); Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc. (collectively, "Barclays"); BNP Paribas and BNP Paribas Securities Corp. (together, "BNP"); Credit Suisse AG, Credit Suisse Group AG, Credit Suisse Securities (USA) LLC, and Credit Suisse International (collectively, "Credit Suisse"); JPMorgan Chase & Co., JPMorgan Chase, N.A., J.P. Morgan Securities LLC,

and JP Morgan Securities PLC (collectively, "JPMorgan"); and UBS Securities LLC ("UBS") (collectively, the "Dealer Defendants"). Tera argues that the district court erred in dismissing its claims by: (1) declining to consider Tera's group-pleading allegations; (2) ignoring many of the alleged forms of parallel conduct; and (3) disregarding a number of the alleged "plus factors." We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, to which we refer only as necessary to explain our decision to affirm.

## BACKGROUND[1]

This antitrust conspiracy lawsuit arises from Tera's unsuccessful attempt to enter the credit default swap ("CDS") trading platform market. A CDS is a widely traded financial instrument that "derives its value from the risk associated with a specified credit event." App'x at 145, ¶ 2 (internal quotation marks omitted). There are two types of CDS: single-name CDS (a derivative based on a single debt instrument issued by one reference entity) and index CDS (a derivative based on a basket of reference entities).

The Dealer Defendants, and other dealer banks, are on the sell-side of the CDS market—they create and sell CDS contracts to buy-side investors, which include mutual funds, hedge funds, and insurance companies. The Dealer Defendants' margin of profit from a CDS transaction is determined by the "bid/ask spread"—that is, the difference between the price at which a Dealer Defendant buys and sells a CDS.

Historically, buy-side investors largely traded CDS through a request-for-quote ("RFQ") system, which required investors, equipped with limited pricing information, to identify

---

[1] The allegations summarized below are taken from the amended complaint, and, in reviewing a dismissal under Federal Rule of Civil Procedure 12(b)(6), we "accept[] all the factual allegations in the complaint as true and draw[] all reasonable inferences in favor of [Plaintiffs]." *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87 (2d Cir. 2013) (internal quotation marks and citation omitted).

themselves to a dealer bank and specify the terms of the CDS they wanted to purchase. Because the RFQ system reinforced the pricing information asymmetry between the dealer banks and the buy-side investors, the dealer banks were allegedly able to quote customers inflated bid/ask spreads on CDS transactions and, as a result, obtain "supracompetitive profits from the CDS market." App'x at 148, ¶ 12.

The passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") in 2008 threatened to upend that profitable system for dealer banks. Dodd-Frank grants regulatory authority over single-name CDS to the Securities and Exchange Commission ("SEC") and over index CDS to the Commodity Futures Trading Commission ("CFTC"). It also authorizes the SEC and CFTC to require that CDS trades be cleared through a central-clearing model and occur on a swap execution facility ("SEF"). An SEF is "a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants." 7 U.S.C. § 1a(50). While the CFTC has required index CDS to be traded on SEFs since 2014, the SEC has not instated such a requirement for single-name CDS. Some SEFs, such as Tradeweb and Bloomberg, continued to support RFQ-based trading.

In the wake of this regulatory overhaul, Tera sought to break into the trading platform market by developing TeraExchange—a SEF offering anonymous CDS trading through a central limit order book ("CLOB") system, which allowed for trading among all market participants. TeraExchange showed early promise and, on June 13, 2014, executed its first anonymous swap transaction through its CLOB system. The trade was cleared by BNP's and JPMorgan's respective clearing divisions. However, TeraExchange would not execute another transaction beyond its first day in business.

From that point forward, the Dealer Defendants refused to trade or clear trades on

5

TeraExchange. On June 16, 2014, BNP informed Tera that it would not clear any more trades on TeraExchange until it completed a "know-your-customer" review ("KYC") and reviewed TeraExchange's rulebook. JPMorgan, citing technical issues, also stopped clearing trades on TeraExchange. Around the same time, UBS—which previously spent months negotiating with Tera and editing TeraExchange's core documents—confirmed internally that it would not cooperate with TeraExchange. Tera "had a similar experience with . . . Credit Suisse." App'x at 169, ¶ 80. At some unspecified point in time, Citi also indicated it would not trade or clear trades on TeraExchange.[2] The Dealer Defendants' and other dealer banks' refusal to clear trades on TeraExchange prevented transactions from occurring on the platform at all, which in turn deprived TeraExchange of the necessary liquidity to operate.

In 2017, Tera filed a complaint asserting antitrust claims against twelve dealer banks. The district court dismissed the claims against six of the dealer banks, but it determined that the complaint plausibly alleged an illegal boycott agreement among the six Dealer Defendants. *See generally Tera Grp., Inc. v. Citigroup, Inc.*, No. 17-CV-4302 (RJS), 2019 WL 3457242 (S.D.N.Y. July 30, 2019) (hereinafter, "*Tera Grp. I*"). However, fact discovery in a separate case called into question the accuracy of certain facts alleged in Tera's complaint, on many of which the district court heavily relied in *Tera Group I*. *See Tera Grp., Inc. v. Citigroup, Inc.*, No. 17-CV-4302 (RJS), 2023 WL 5211252, at *4 (S.D.N.Y. Aug. 14, 2023) (hereinafter "*Tera Grp. II*"). The Dealer Defendants served a Rule 11 notice on Tera and demanded that it withdraw the contested allegations from its complaint. *See id*. Tera complied, filing an amended complaint that excised some of those allegations altogether while paring back others. The Dealer Defendants then moved

---

[2] The amended complaint does not make any specific allegations against Barclays, and Tera's counsel conceded at oral argument that the amended complaint does not state a claim against Barclays.

to dismiss the amended complaint, which the district court granted. This appeal followed.

**DISCUSSION**

We review *de novo* a district court's dismissal of a complaint for failure to state a claim under Rule 12(b)(6). *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (hereinafter, "*Citigroup*"). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). In reviewing a Sherman Act Section 1 claim, "we evaluate each set of allegations separately, [but] do so only as part of our assessment of the alleged conspiracy as a whole." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs. Corp.*, 92 F.4th 381, 403 (2d Cir. 2024) (hereinafter, "*Treasuries*").[3]

Section 1 of the Sherman Act bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "The crucial question in a Section 1 case is therefore whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010) (alteration adopted) (internal quotation marks and citation omitted). Thus, "plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed." *Citigroup*, 709 F.3d at 136. Absent direct evidence, a conspiracy or agreement "may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial

---

[3] We have also observed that, given the "potentially enormous cost of fact discovery" in antitrust cases, "district courts retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.4 (2d Cir. 2007) (per curiam) (internal quotation marks and citation omitted).

evidence and plus factors." *Todd v. Exxon Corp.* 275 F.3d 191, 198 (2d Cir. 2001). But although parallel conduct may be "consistent with conspiracy," it can also be "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). To move an allegation of prior agreement across the line from possible to plausible, then, a plaintiff's "allegations of parallel conduct must be reinforced by 'plus factors' that provide a basis to infer that a conspiracy arose." *Treasuries*, 92 F.4th at 391 (citing *Citigroup*, 709 F.3d at 136). Those plus factors may include, but are not limited to, "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Citigroup*, 709 F.3d at 136. Crucially, "even if a plaintiff alleges additional facts or circumstances . . . these facts must still lead to an inference of conspiracy." *Id*. at 137.

Here, assuming *arguendo* that Tera has sufficiently pled one or more acts of parallel conduct, we conclude that Tera failed to allege plus factors that support a plausible inference that the Dealer Defendants' parallel conduct resulted from an unlawful agreement.[4] *See Twombly*, 550 U.S. at 557. We discuss each alleged plus factor in turn below.

***Common Motive to Conspire***. As the district court observed, the common motive to conspire here—boycotting TeraExchange to preserve the RFQ system of trading and its attendant profits—is obvious. *See Tera Grp. II,* 2023 WL 5211252, at *6. This plus factor standing alone, however, does not "lead to an inference of conspiracy." *Citigroup*, 709 F.3d at 137. It is nearly

---

[4] Although parties spilled much ink arguing whether the district court improperly ignored the amended complaint's group-pleading allegations, we need not wade into that argument. On *de novo* review, we have considered the entire amended complaint, including the group-pleading allegations, and conclude that Tera has failed to allege a plausible antitrust claim against any of the Dealer Defendants.

always the case that, where, as here, a market is crowded with established participants, each incumbent business has an incentive to exclude a newcomer in order to protect its own market share. *See Twombly*, 550 U.S. at 556 ("The economic incentive to resist was powerful, but resisting competition is routine market conduct . . . ."). Moreover, the effectiveness of the exclusion will often depend on the number of boycotting incumbents. If alleging the efficacy of a group boycott alone were sufficient to survive a motion to dismiss, then "pleading a § 1 violation against almost any group of competing businesses would be a sure thing." *Id*. Put differently, this plus factor fails to break the tie because it "lead[s] to an equally plausible inference of mere interdependent behavior." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987).

*Against Individual Interest*. Tera next asserts that boycotting its platform was against the economic self-interest of each individual Dealer Defendant. We are unpersuaded. Tera contends that, because each Dealer Defendant could earn fees from clearing trades on TeraExchange, it was irrational for an individual Dealer Defendant to leave those fees on the table for a competitor to collect instead. However, as the district court pointed out, each Dealer Defendant had a clear economic incentive to steer buy-side customers away from TeraExchange onto RFQ-friendly platforms. *See Tera Grp. II*, 2023 WL 5211252, at *7. As noted *supra*, the amended complaint emphasizes that the RFQ system resulted in "supracompetitive profits" for the Dealer Defendants because of the large bid/ask spread they could obtain through taking advantage of the pricing information disparity. App'x at 148, ¶ 12. In fact, according to the amended complaint, Citi sought to steer one customer away from TeraExchange by offering to clear its trades *for free* if it transacted via an RFQ protocol on a different platform. These allegations indicate that clearing fees were dwarfed by the profits a Dealer Defendant could earn through potential RFQ trades. Given these alleged market dynamics, each Dealer Defendant could have rationally and

9

independently chosen to forego any clearing fees it could have earned on TeraExchange in hopes of pushing buy-side customers to execute RFQ trades. Tera does not plausibly allege that the clearing fees were more valuable than RFQ trading.

Tera counters that the conduct of the Dealer Defendants still contravened their respective individual interests because, absent a boycott agreement, one Dealer Defendant could opt to transact on TeraExchange, provide it with sufficient liquidity, and take all of the clearing fees. But Tera does not plead facts suggesting that it would not be a sound business strategy for each Dealer Defendant to take a wait-and-see approach. If, once the dust settled, it was clear that TeraExchange would survive through its partnership with one Dealer Defendant, the other Dealer Defendants could simply elect to join the platform at that time. The fact that some of the Dealer Defendants allegedly negotiated with Tera or expressed interest in TeraExchange is entirely consistent with such a strategy.

***High Level of Interfirm Communications***. Although once a strong factor in favor of Tera's conspiracy claim, the amended complaint's allegations no longer possess the requisite specificity to indicate a high level of interfirm communications. Tera's original complaint alleged that four different Dealer Defendants informed Tera "almost simultaneously" that they would not clear trades until they completed an "audit" of TeraExchange's rulebook, App'x at 85, ¶ 95, and that they also each referred to TeraExchange with the unusual metaphor of a "Trojan Horse," *id*. at 95, ¶ 126. The amended complaint, however, either omits or substantially revises these allegations. As amended, the allegations no longer plausibly suggest that the Dealer Defendants actually utilized the phrase "Trojan Horse." *See* App'x at 178, ¶ 103 ("TeraExchange learned that the Dealer Defendants regarded TeraExchange's platform as a 'Trojan Horse.'"). Moreover, although the amended complaint alleges that both BNP and JPMorgan sought to review Tera's

10

rulebook, the amended complaint no longer alleges that four Dealer Defendants made the requests simultaneously or used the specific term "audit" in those requests. These revised allegations thus lack the particularity of language and unison of timing to plausibly suggest a high level of interfirm communications.

Instead, the amended complaint now merely alleges that the Dealer Defendants *could* have coordinated because "their clearing operations communicate regularly with each other." App'x 173, ¶ 90. "But the law is clear that the mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 466 (2d Cir. 2019) (alteration adopted) (internal quotation marks and citation omitted).

***Other Plus Factors***. The remaining pieces of circumstantial evidence alleged in the amended complaint fail individually, as well as in combination with the other allegations, to articulate plus factors that plausibly support the existence of an unlawful agreement.

First, although Tera asserts that the Dealer Defendants have a history of *potential* antitrust violations in the CDS market, that allegation does not provide a sufficient basis to rationally infer a conspiracy in this case. Tera alleges that regulators investigated dealer banks' conduct in the CDS market in 2011, but Tera does not allege that these investigations were directed at the Dealer Defendants. And Tera "do[es] not allege any enforcement action taken or charges brought as a result of the investigation[s]." *Treasuries*, 92 F.4th at 405. Tera points to dealer banks' settlement of an unrelated antitrust class action case from 2015. However, Tera does not allege that the Dealer Defendants were found to have, or admitted to having, engaged in any antitrust violations in that case. Similarly, Tera's allegation that the Dealer Defendants are currently under government regulatory investigation for unspecified misconduct in the interest rate swaps market is not

11

probative of their conduct in the CDS market. The Dealer Defendants' conduct in different markets, with respect to different products, is not circumstantial evidence of the conspiracy alleged here. *See In re Elevator Antitrust Litig.*, 502 F.3d at 52 (explaining that allegations of defendants' anticompetitive wrongdoing in a different market, "absent any evidence of linkage" to the alleged conduct in a given case, "is merely to suggest . . . that if it happened there, it could have happened here" and does not support an inference of conspiracy (internal quotation marks omitted)).

Tera also argues that the Dealer Defendants' control over the CDS market and the clearing process gave them the means to block CDS transactions on TeraExchange. However, merely possessing the capability to carry out an effective boycott does not suggest that such a boycott resulted from any agreement. Importantly, there is no allegation that any of the Dealer Defendants needed the approval of another to utilize its tools of resistance against TeraExchange.

Finally, Tera asserts that that its boom-and-bust history shows that it was the boycott, rather than natural market forces, that caused TeraExchange's failure. To be sure, the dealer banks' refusal to transact on TeraExchange may well have contributed to its economic demise. However, even if that demise was a consequence of the alleged boycott by each of the Dealer Defendants, that outcome alone does not suggest that it was the result of a conspiracy.

In sum, the allegations in the amended complaint do not support a plausible inference of a prior agreement. Viewed holistically, Tera's allegations "do not plausibly rebut the inference that the [Dealer Defendants'] conduct served their respective, individual, legitimate business interests

12

to maintain a profitable and reliable market structure." *Treasuries*, 92 F.4th at 390. Accordingly, we affirm the district court's dismissal of Tera's antitrust conspiracy claims.[5]

*      *      *

We have considered Tera's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

---

[5] Because Tera failed to state a plausible Sherman Act claim, the district court correctly dismissed its Donnelly Act claim. *See Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 101 (2d Cir. 2019) (finding that because plaintiff "has not stated a plausible claim for relief under the Sherman Act, its Donnelly Act claim similarly fails").