*Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*

# In the
# United States Court of Appeals
# for the Second Circuit

---

August Term 2024
Argued: May 2, 2025
Decided: August 6, 2025
Amended: October 15, 2025

No. 24-598

---

MOSAIC HEALTH, INC.,
CENTRAL VIRGINIA HEALTH
SERVICES, INC., INDIVIDUALLY
AND ON BEHALF OF ALL THOSE
SIMILARLY SITUATED,
*Plaintiffs-Appellants*,

v.

SANOFI-AVENTIS U.S., LLC, ELI LILLY AND COMPANY, LILLY USA, LLC, NOVO
NORDISK INC., ASTRAZENECA PHARMACEUTICALS LP,
*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Western District of New York
No. 21-cv-6507
Elizabeth A. Wolford, *Chief Judge*

---

Before: PÉREZ, NATHAN, AND KAHN, *Circuit Judges.*

On appeal from a judgment of the United States District Court for the
Western District of New York (Wolford, *C.J.*).

Several federally funded health centers and clinics filed a class action complaint against a group of drug manufacturers alleging violations of federal and state antitrust laws, and state common law, through concerted action to restrict drug discounts offered to contract pharmacies. The United States District Court for the Western District of New York dismissed the first amended complaint and denied leave to file a second amended complaint. Plaintiffs timely appealed.

We conclude that the proposed second amended complaint plead enough facts to give rise to a plausible inference of a horizontal price-fixing conspiracy under Section 1 of the Sherman Act, 15 U.S.C. § 1.

Therefore, we **VACATE** the district court's judgment dismissing Plaintiffs' suit and denying leave to amend and **REMAND** for the district court to grant Plaintiffs leave to file their second amended complaint.

---

BRIAN MARC FELDMAN, Aurelian Law PLLC, Rochester, NY (Sheila Baynes, Aurelian Law PLLC, Rochester, NY, Ellen Meriwether, Cafferty Clobes Meriwether & Sprengel LLP, Chicago, IL, Lauren R. Mendolera, Harter Secrest & Emery LLP, Buffalo, NY, *on the briefs*), *for Plaintiffs-Appellants*.

JOHN C. O'QUINN, Kirkland & Ellis LLP, Washington, D.C. (Megan McGlynn, Lucas H. Funk, Kirkland & Ellis LLP, Washington, D.C., Daniel E. Laytin, Alyssa C. Kalisky, Katie R. Lencioni, Kirkland & Ellis LLP, Chicago, IL, *on the brief*), *for Defendants-Appellees Eli Lilly and Company and Lilly USA, LLC*.

Ashley C. Parrish, King & Spalding LLP, Washington, D.C., Lohr A. Beck, King & Spalding LLP, Atlanta, GA, *for Defendant-Appellee Novo Nordisk Inc.*

C. Scott Lent, Arnold & Porter Kaye Scholer LLP, New York, NY, Matthew Tabas, Allon Kedem, Arnold & Porter Kaye Scholer LLP, Washington, D.C., *for Defendant-Appellee AstraZeneca Pharmaceuticals LP*.

Rajeev Muttreja, Jones Day, New York, NY, *for Defendant-Appellee Sanofi-Aventis U.S. LLC*.

MYRNA PÉREZ, *Circuit Judge*:

While much of this opinion includes doctrinal jargon unique to antitrust cases, at bottom, this appeal is about whether Plaintiffs-Appellants met the low pleading threshold for surviving a motion to dismiss. Here, properly granting all inferences and crediting all non-conclusory facts, Plaintiffs' proposed second amended complaint pled sufficient facts to substantiate their antitrust allegations at the motion to dismiss stage. Accordingly, the district court erred in denying Plaintiffs' motion for leave to amend their complaint as futile and ultimately dismissing Plaintiffs' complaint. We vacate the district court's dismissal of the complaint and remand the case to the district court for further proceedings consistent with this opinion.

## BACKGROUND

Plaintiffs filed a putative class action alleging that Defendants violated state and federal antitrust laws, as well as state common law, by engaging in a horizontal price-fixing conspiracy. Specifically, Plaintiffs allege that Defendants conspired, in violation of Section 1 of the Sherman Act, to limit a drug discount offered to safety-net hospitals and clinics that purchase diabetes drugs filled at retail pharmacies. As is our obligation at this stage of the proceeding, the facts that follow are construed in the light most favorable to Plaintiffs.

Plaintiffs Mosaic Health, Inc. and Central Virginia Health Services, Inc. are two federally funded health centers (collectively, "Plaintiffs") operating safety-net clinics that serve low-income, underserved patient populations and provide medications to patients in need with sliding-fee discounts. Mosaic Health, Inc. operates twenty-two safety-net clinics in New York, and Central Virginia Health Services, Inc. operates eighteen safety-net clinics in Virginia. Defendants Sanofi-Aventis U.S., LLC ("Sanofi"), Eli Lilly and Company and Lilly USA, LLC (together, "Eli Lilly"), Novo Nordisk Inc. ("Novo Nordisk"), and AstraZeneca Pharmaceuticals LP ("AstraZeneca") (collectively, "Defendants") are a group of drug manufacturers who produce drugs covered by Medicare and Medicaid.

Together, Defendants control three diabetes drug production markets: (i) rapid-acting analog insulins, (ii) long-acting analog insulins, and (iii) incretin mimetics. Defendants compete against each other as horizontal competitors in these diabetes drug production markets. Defendants Sanofi, Eli Lilly, and Novo Nordisk compete in the sale of rapid-acting and long-acting analog insulins, and all four Defendants compete in the sale of incretin mimetics. Within the United States, Defendants report billions of dollars in sales of rapid acting analog insulins, long-acting analog insulins, and incretin mimetics, which contribute significantly to each company's overall financial performance.

The drug discount that Defendants allegedly conspired to limit was offered through their participation in a program created pursuant to Section 340B of the Public Health Service Act, 42 U.S.C. § 256b (the "Section 340B Drug Discount Program"). The Section 340B Drug Discount Program creates a discount for participating healthcare providers by imposing a ceiling price and requiring each manufacturer to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price" (the "Section 340B Drug Discount"). 42 U.S.C. § 256b(a)(1). Importantly, manufacturers providing drugs covered by

5

Medicare and Medicaid, "must offer" the Section 340B Drug Discount.[1] *See Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 115 (2011) (first citing 42 U.S.C. § 256b(a); and then citing *id.* § 1396r-8(a)(1)); *see also Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 730 (2022).

For at least a decade, Defendants offered the Section 340B Drug Discount to safety-net hospitals and clinics for purchase and distribution by retail pharmacies. By regularly offering Section 340B Drug Discounts, Defendants were able to lower healthcare costs for patients in need of discounted medications.

But, beginning in 2020, Defendants collectively lobbied the federal government to limit the Section 340B Drug Discount Program as applicable to diabetes medications. Defendants used the firm Tarplin, Downs & Young LLC to assist with lobbying efforts related to the Section 340B Drug Discount Program. Additionally, Defendants Sanofi and AstraZeneca separately retained the lobbying firm W Strategies, LLC for the same purpose. Defendants Sanofi, Eli

---

[1] Since 1996, the United States Department of Health and Human Services has taken the position that because, historically, few safety-net providers operate in-house pharmacies, they might participate in "bill to, ship to" arrangements whereby covered providers purchase the discounted drugs for shipment to community pharmacies (also called "contract pharmacies"), to be dispensed to the safety-net providers' patients there. *See* Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43549, 43552 (Aug. 23, 1996); *see also id.* at 43549 ("It has been the Department's position that if a covered entity using contract pharmacy services requests to purchase a covered drug from a participating manufacturer, the statute directs the manufacturer to sell the drug at the discounted price.")

Lilly, and Novo Nordisk also retained the lobbying firm Williams and Jensen, PLLC. Tarplin, Downs & Young and Williams and Jensen, PLLC also worked on the same lobbying efforts with PhRMA, a drug manufacturers' association of which all Defendants are members.

The Defendants' lobbying efforts were unsuccessful in limiting the Section 340B Drug Discount Program. On July 24, 2020, President Trump issued Executive Order 13937 entitled "Access to Affordable Life-Saving Medications," which addressed the use of insulin and epinephrine within the Section 340B Drug Discount Program but remained extremely limited in scope and impact on the volume of Section 340B Drug Discounts. That same day, Defendant AstraZeneca informed the United States Department of Health and Human Services ("HHS") privately that beginning October 1, 2020, it would no longer provide the Section 340B Drug Discount to contract pharmacies, except that safety-net providers could ship discounted drugs to one contract pharmacy if they did not operate an on-site dispensing pharmacy. AstraZeneca publicly announced this plan in mid-August 2020.

On or about July 27, 2020, Defendant Sanofi also publicly announced that starting October 1, 2020, it would cut off Section 340B Drug Discounts at contract

7

pharmacies, except if providers would send prescription-claims data to a Sanofi vendor.

On August 19, 2020, Defendant Eli Lilly sent HHS a private letter stating that on September 1, 2020, it would cease to permit Section 340B Drug Discounts, except where a safety-net provider lacked an in-house pharmacy and instead selected a single community pharmacy to service its patients. Eli Lilly also "added a special exception to permit Contract Pharmacies to pass along certain insulins products at cost," however Plaintiffs allege that the "exception was infeasible for covered entities and pharmacies, as it required Contract Pharmacies to fill prescriptions without any fee." J. App'x 815. Eli Lilly stated that it would offer the Section 340B Drug Discount only when "[n]o insurer or payer is billed for the Lilly insulin dispensed" and "[n]either the covered entity nor the contract pharmacy marks-up or otherwise charges a dispensing . . . fee for the Lilly insulin." *Id.*

On December 1, 2020, Defendant Novo Nordisk informed HHS that on January 1, 2021, it would cease to offer Section 340B Drug Discounts altogether, except for non-hospital covered entities, like clinics.

8

Collectively, all four Defendants imposed Section 340B Drug Discount restrictions that Plaintiffs allege resulted in significant financial loss to safety-net hospitals and clinics.

Plaintiff Mosaic Health, Inc. filed a class action complaint against Defendants alleging violations of federal and state antitrust laws, as well as state common law. Central Virginia Health Services, Inc. joined as a plaintiff in an amended complaint. Defendants successfully moved to dismiss the first amended complaint.

Plaintiffs then moved for leave to file the proposed second amended complaint. The district court denied the Plaintiffs' motion, reasoning that Plaintiffs failed to allege parallel conduct and failed to plausibly allege the requisite factual circumstances giving rise to an inference of conspiracy. Plaintiffs timely appealed.

**STANDARD OF REVIEW**

We review the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) de novo. *See Gelboim v. Bank of America Corp.*, 823 F.3d 759, 769 (2d Cir. 2016) (citation omitted). "The denial of leave to amend is similarly reviewed *de novo*" when "the denial was based on an interpretation of law, such

9

as futility." *Id*. (internal quotation marks and citation omitted). At this stage of the proceedings, "we accept all factual allegations as true and draw every reasonable inference from those facts in the plaintiff's favor." *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013). The complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

**APPLICABLE LAW**

Plaintiffs' claims here arise from antitrust law. An antitrust plaintiff must plead facts with sufficient particularity in the complaint to state a cause of action or face dismissal of the lawsuit. *Id.* at 136.

Section 1 of the Sherman Act prohibits agreements that unreasonably restrain trade. *See* 15 U.S.C. § 1 (criminalizing "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce").[2] This case requires us to examine whether Plaintiffs pled sufficient evidence of an agreement to conspire. Pleading facts sufficient to support an allegation of an

---

[2] A horizontal price-fixing scheme is a particular type of Sherman Act violation that "involve[s] coordination between competitors at the same level of a market structure." *United States v. Apple, Inc.*, 791 F.3d 290, 313 (2d Cir. 2015) (internal quotation marks and citation omitted) (alteration adopted). Such schemes are, "with limited exceptions, *per se* unlawful" under the Sherman Act. *Id*. at 313–14. Accordingly, we need not evaluate whether trade was unreasonably restrained.

10

antitrust conspiracy may be accomplished in one of two ways. "[A] plaintiff may . . . assert direct evidence," such as a recorded phone call, "that the defendants entered into an agreement in violation of the antitrust laws." *Citigroup*, 709 F.3d at 136. But conspiracies are rarely evidenced by explicit agreements. Nearly always a conspiracy must be proven through "inferences that may fairly be drawn from the behavior of the alleged conspirators," *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir. 1976); *see also United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) ("[C]onspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with . . . precision." (internal quotation marks and citation omitted)). Because such a "smoking gun" is "hard to come by," we also accept "circumstantial facts supporting the *inference* that a conspiracy existed." *Citigroup*, 709 F.3d at 136 (emphasis in original).

The Supreme Court first set forth the standard for supporting a plausible inference of an antitrust conspiracy at the motion to dismiss stage in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). There, the Supreme Court held that "stating . . . a [Section 1] claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.

11

In other words, the complaint must contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* As a means of smoking out the illegal agreement, courts have required plaintiffs to allege, with the requisite factual support, "certain parallel conduct" by the alleged conspirators and "some factual context suggesting agreement, as distinct from identical, independent action." *Id. at* 548–49.

The requisite factual circumstances are "often referred to as 'plus' factors." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987). Plus factors

> may include traditional evidence of conspiracy: statements permitting an inference that the defendants entered into an agreement. They may also include evidence of other circumstances giving rise to a less direct inference of conspiracy, such as 'a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications.'

*Anderson News, L.L.C. v. American Media, Inc.*, 899 F.3d 87, 104 (2d Cir. 2018) ("*Anderson News II*") (quoting *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015)).

Recognizing that parallel conduct alone could be because of "chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," *Twombly*, 550 U.S. at

12

556 n.4 (quotation marks omitted), courts require a plaintiff seeking to plead a Section 1 violation to meet both requirements—parallel conduct and plus factors—in order to nudge their complaint across "the line between possibility and plausibility of entitlement to relief." *Id*. at 557 (internal quotation marks and citation omitted) (alteration adopted).

But to be clear, *Twombly*'s requirement to plead something "more" than parallel conduct does not impose a probability standard at the motion-to-dismiss stage. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). This Court has previously disallowed conflation of probability and plausibility. For example, in *Anderson News I*, this Court reversed a district court's order granting a motion to dismiss where plaintiff, a magazine wholesaler, alleged that defendants, publishers and their distributors, plausibly engaged in parallel conduct by withdrawing their business from the plaintiff following the plaintiff's announcement of a new surcharge on magazine shipments. *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 168–71 (2d Cir. 2012) ("*Anderson News I*"). The district court held that, "[t]he most plausible scenario, however, is that the Defendants each separately came to a similar conclusion—that they did not want to pay a 7–cent surcharge." *Anderson News, L.L.C. v. American Media, Inc.*, 732 F. Supp. 2d 389, 407

(S.D.N.Y. 2010), *vacated and remanded*, 680 F.3d 162 (2d Cir. 2012). This Court concluded that "on a Rule 12(b)(6) motion it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives. Assuming that [plaintiff] can adduce sufficient evidence to support its factual allegations, the choice between or among plausible interpretations of the evidence will be a task for the factfinder." *Anderson News I*, 680 F.3d at 190. At the motion to dismiss stage, our precedent makes clear that a plaintiff must simply allege enough facts to support the *inference* that a conspiracy actually existed. *See Citigroup*, 709 F.3d at 136.

## DISCUSSION

As a threshold matter, Defendants argue that the Supreme Court's decisions in *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), bar Plaintiffs from asserting claims under the Sherman Act and seeking damages, on the grounds that Plaintiffs are indirect purchasers of Defendants' drugs and therefore lack antitrust standing. Before delving into why Plaintiffs pled sufficient allegations to survive a Rule 12(b)(6) motion to dismiss a Sherman Act Section 1 claim,[3] we explain why Defendants are incorrect in arguing

---

[3] For the purposes of this appeal, we chiefly consider Plaintiffs' proposed second amended complaint, which the district court denied the Plaintiffs leave to file after concluding that they had not cured the

14

that the safety-net providers are barred from challenging their alleged horizontal price-fixing.

## I. *Astra* and *Illinois Brick* Pose No Bar

The Supreme Court's decisions in *Astra* and *Illinois Brick Co.* do not bar Plaintiffs from bringing this action alleging antitrust violations.

### A. *Astra* Does Not Bar Sherman Act Claims

In *Astra*, a group of medical facilities brought an action against a group of pharmaceutical manufacturers for breach of contract alleging that they overcharged the medical facilities for certain drugs, in violation of the Pharmaceutical Pricing Agreement between the manufacturers and the federal government.[4] 563 U.S. at 113. The Supreme Court determined there is no private right of action for a covered entity, including safety-net providers, to sue manufacturers for violations of Section 340B. *Id*. Similarly, the Supreme Court held that overcharged covered entities also have no right to sue as third-party beneficiaries to enforce the Pharmaceutical Pricing Agreements that drug

---

deficiencies of the first amended complaint. *See Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 714 F. Supp. 3d 209, 218 (W.D.N.Y. 2024).

[4] "Drug manufacturers opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement (PPA) used nationwide." *Astra*, 563 U.S. at 113. Pharmaceutical Pricing Agreements "are uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary of HHS." *Id.*

manufacturers sign with HHS. *Id*. This is because, notwithstanding their name, Pharmaceutical Pricing Agreements are not "bargained-for contracts" incorporating "negotiable terms." *Id*. at 113, 118. Rather, Pharmaceutical Pricing Agreements merely "serve as the means by which drug manufacturers opt into the statutory scheme." *Id*. at 118. The Supreme Court reasoned that "[a] third-party suit to enforce an HHS-drug manufacturer agreement . . . is in essence a suit to enforce the statute itself." *Id.* at 118. Thus, "[t]he absence of a private right to enforce the statutory ceiling-price obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the contract's ceiling-price obligations instead." *Id*.

Disallowing the action at issue in *Astra*, the Supreme Court recognized that "a multitude of dispersed and uncoordinated lawsuits" to enforce Pharmaceutical Pricing Agreements, "[w]ith HHS unable to hold the control rein," would ultimately "undermine the agency's efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.* at 120.

Defendants make two incorrect *Astra*-related arguments that they claim preclude suit. First, they incorrectly claim that the limits on Plaintiffs to bring Section 340B contract claims as indirect purchasers means Plaintiffs cannot bring

Sherman Act claims. *Astra* says no such thing. Plaintiffs do not seek to enforce the Section 340B Drug Discount mandates nor the Pharmaceutical Pricing Agreements to compel the drug manufacturers to offer the discounted drugs at a specific Section 340B ceiling price. Plaintiffs make clear that the second amended complaint is "agnostic as to [the] question" of whether Defendants violated Section 340B. J. App'x 900. The instant case does not turn on the meaning of the Section 340B statute nor on a determination from this Court as to whether Defendants violated Section 340B. Plaintiffs here would seek to enjoin the Defendants' alleged price-fixing independent of the district court finding that Defendants violated Section 340B.

Second, Defendants claim Plaintiffs' grievances over the limitations or denials of Section 340B pricing are entirely governed by the federal Section 340B program, and their remedy for resolving disputes is within the administrative scheme that Congress established and which the Supreme Court held is exclusive in *Astra*. *See* Appellees' Br. 5. Unlike the overcharge claims at issue in *Astra*, Congress did not intend for the Health Resources and Services Administration ("HRSA"), a unit of HHS, to adjudicate and enforce antitrust price-fixing claims. In *Astra*, the Supreme Court established that Congress "opted to strengthen and formalize HRSA's enforcement authority, to make the new adjudicative

17

framework the proper remedy for covered entities complaining of 'overcharges and other violations of the discounted pricing requirements,'. . . and to render the agency's resolution of covered entities' complaints binding." 563 U.S. at 121–22 (internal citations omitted). This principle makes sense when safety-net providers themselves are not a party to the Pharmaceutical Pricing Agreements that would be at issue in such an action.

Furthermore, the Supreme Court in *Astra* reasoned that where the Section 340B Drug Discount program is superintended by HRSA, "Congress directed HRSA to create a formal dispute resolution procedure, institute refund and civil penalty systems, and perform audits of manufacturers" to help ensure that "covered entities pay at or below the ceiling price." *Id*. at 121 (internal quotation marks omitted) (alteration adopted); *see also* 124 Stat. 823–827, 42 U.S.C. § 256b(d). At bottom, *Astra* makes plain that Congress vested authority in HHS to oversee compliance with the Section 340B Drug Discount Program and enforce the ceiling price contracts, not to police antitrust violations.

## B. *Illinois Brick* Does Not Preclude this Action

Antitrust standing, at least at the pleading stage, is quite broad. *See Gelboim*, 823 F.3d at 777 (stating that the unrestrictive language of the private action

provision of the Clayton Act demonstrates the congressional purpose in enacting this remedial provision and cautioning courts not to cabin its broad remedial objective). All plaintiffs must show is that they suffered an antitrust injury and are efficient enforcers of antitrust laws. *Id*. at 772. Moreover, plaintiffs can bring an antitrust claim alleging a Sherman Act conspiracy even when the underlying act would be lawful if undertaken alone, outside of a conspiracy. For example, in *Apple*, Apple entered into separate contracts with five major book publishers to adopt an agency pricing model for ebooks. 791 F.3d at 296. Plaintiffs alleged that Apple consciously organized a conspiracy among the publisher defendants to raise consumer-facing ebook prices. *Id*. at 314. In response, Apple argued that the contracts at issue were vertical, lawful agreements that were in Apple's independent economic interest. *Id*. This Court, rejecting Apple's argument, held that "Apple's benign portrayal of its [c]ontracts with the [p]ublisher [d]efendants [was] not persuasive—not because those [c]ontracts themselves were independently unlawful, but because, in context, they provide[d] strong evidence that Apple consciously orchestrated a conspiracy among the [p]ublisher [d]efendants." *Id*. at 316. Similarly, in *Gelboim*, plaintiffs, who were purchasers of financial instruments, accused defendants, the banks issuing the financial

19

instruments, of colluding to depress the London Interbank Offered Rate ("LIBOR") by violating the rate-setting rules. 823 F.3d at 764. This Court held that the plaintiffs plausibly alleged that the defendants were conspiring to artificially depress the LIBOR rate in violation of the Sherman Act. *Id*. at 765. At bottom, *Apple* and *Gelboim* make plain that while individual agreements may be lawful on their own, the defendants' role in organizing a conspiracy to restrict trade triggers Section 1 liability.

*Illinois Brick* does not preclude Plaintiffs from pursuing the federal damages they seek for antitrust violations or injunctive relief. 431 U.S. 720. In *Illinois Brick*, the Supreme Court held that indirect purchasers alleging overcharge claims do not have standing to sue for antitrust violations under the Clayton Act. *Id*. at 746. The Supreme Court barred indirect purchaser claims out of concern for duplicative recoveries and the complexities of tracing overcharges through multiple levels of distribution. *Id*. at 730–35. Here, Plaintiffs have expressly disclaimed damages for overcharges in relation to their claims that are governed by *Illinois Brick*.[5] Where *Illinois Brick* might apply, Plaintiffs seek damages not for losses incurred due to

[5] In the second amended complaint, Plaintiffs specifically limit their request for damages for the federal antitrust claim to the lost profits described herein and injunctive relief. *See* J. App'x at 871. Plaintiffs do, however, seek damages related to overcharges in connection with the subset of their state law claims that are not governed by the limitations in *Illinois Brick*. *See* J. App'x at 873; *see also* Reply Br. at 37 n.9.

20

increasing prices, but instead, for losses incurred as a result of "lost access[.]" Reply Br. at 36–37. Because such damages do not implicate the concerns at the heart of *Illinois Brick*, nor do they concern multiple levels of distribution, the Court holds that Plaintiffs are not precluded from seeking damages in this limited form. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 475 (1982) (holding *Illinois Brick* does not apply where there is "not the slightest possibility of a duplicative exaction"); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 606 (7th Cir. 1997) (noting in dicta that *Illinois Brick* would "fall away" where no overcharge damages were sought). Furthermore, Plaintiffs seek injunctive relief to enjoin the alleged horizontal price-fixing conspiracy under Section 16 of the Clayton Act, 15 U.S.C. § 26. Because standing under Section 16 raises no threat of multiple lawsuits or duplicative recoveries, "some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16." *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 856 (3d Cir. 1996) (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986)) (internal quotation marks omitted). Therefore, *Illinois Brick* does not apply here.

## II. Plaintiffs' Proposed Second Amended Complaint Sufficiently Pleads a Conspiracy

Plaintiffs plead sufficient facts in their proposed second amended complaint to support their allegations of parallel conduct and plus factors.

### A. Plaintiffs Sufficiently Plead Parallel Conduct

Defendants would have us define parallel conduct as conduct with precise similarities, urging us to focus on the differences among the Defendants' conduct.[6] But, the Supreme Court and our binding authority that followed rejects setting a high bar for what constitutes parallel conduct. Rather, conduct is deemed "parallel" when there are general similarities in substance, timing, or effect. In *Twombly*, the Supreme Court agreed that plaintiffs had sufficiently alleged parallel conduct where over seven years the defendant telephone carriers deployed various strategies with the collective effect of inflating charges for local telephone and high-speed internet services. 550 U.S. at 550–53 (ranging from making unfair agreements with competitive local exchange carriers, providing inferior connections to networks, overcharging, and billing in ways to sabotage plaintiffs'

---

[6] When asked at oral argument why Defendants could not have colluded together to cleverly stagger to avoid detection, Defendants responded "so they could have done that but not at the same time that they stupidly clustered AstraZeneca's announcement only one business day away from Sanofi's announcement. That's what doesn't make sense if they are being clever." *See generally* Or. Arg. 19:00–19:42. The law does not require the collusion to be cleverly disguised to constitute parallel conduct.

customer relations); *see also American Tobacco Co. v. United States*, 328 U.S. 781, 800–01 (1946) (detailing a price-fixing conspiracy in which the defendants used a different methods to achieve the same ultimate objective, an understood and settled price for tobacco). In adequately pleading parallel conduct, the *Twombly* plaintiffs alleged only high-level similarities among the defendants' conduct, including that defendants had "entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and ha[d] agreed not to compete with one another and otherwise allocated customers and markets to one another." *Twombly*, 550 U.S. at 551 (internal quotation marks and citation omitted).

Precedent in this Circuit post-*Twombly* has similarly accepted a broad understanding of what constitutes parallel conduct. *See, e.g., Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010) (rejecting the argument that antitrust plaintiffs are "required to mention a specific time, place or person involved in each conspiracy allegation"). Of course, this Court has found parallel conduct where defendants allegedly acted at almost the exact same time in imposing near identical contractual terms or engaging in the same market action. *See, e.g., id.* at 323 (describing alleged parallel conduct where two groups of defendants launched

two joint ventures for providing music over the internet; used similar most-favored nation agreements in their licenses with the joint ventures to enforce a wholesale price floor at 70 cents per song raised uniformly on or about May 2005; and refused to do business with the second biggest internet music retailer); *Citigroup,* 709 F.3d at 138 (describing alleged parallel conduct where the largest financial institutions simultaneously ceased buying action-rate securities on the same day).  But this Court has also found parallel conduct where plaintiffs alleged that defendants acted with a similar anticompetitive effect but through varied means.  *See e.g., Anderson News I,* 680 F.3d at 191 (describing as the "key parallel conduct allegation" that all publisher and distributor defendants ceased doing business with the plaintiff despite different reactions from the defendants to the plaintiff's announcement of a surcharge).

Our Sister Circuits have similarly held that parallel conduct among defendants should be viewed with a broad lens.  *See e.g., SD3, LLC v. Black & Decker (U.S.) Inc.,* 801 F.3d 412, 428–29 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) (explaining that existing authority does not require finding parallel conduct only when defendants move in relative lockstep that achieves common anticompetitive ends by substantially identical means); *Evergreen Partnering Grp.,*

*Inc. v. Pactiv Corp.*, 720 F.3d 33, 46 n.3 (1st Cir. 2013) (noting that the examples of parallel conduct outlined in *Twombly* are "very broad" and that allegations supportive of agreement at the pleadings stage may include "conduct that indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement" (internal quotation marks omitted)); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999) (acknowledging that "parallel pricing does not require uniform prices" but can include "prices within an agreed upon range" (internal quotation marks omitted)).

From the precedents in our own Circuit, and drawing upon the reasoning of others, it is plain that antitrust plaintiffs need not plead the exact same conduct within a tight timeline to state a claim under Section 1 of the Sherman Act. Rather, plaintiffs must state facts consistent with defendants' having engaged in conduct that contributes to an inference of concerted action.

The proposed second amended complaint plausibly alleges that Defendants acted similarly enough in substance by restricting Section 340B Drug Discount pricing and raising prices in the market of certain popular diabetes medication over the course of months. By implementing similar policies of primarily refusing to permit the sale of Section 340B Drugs to covered entities, Defendants eliminated

the majority of their Contract Pharmacy Section 340B Drug Discount sales, earned higher profits, and avoided competition from their direct competitors over the availability of Section 340B Drug Discounts on rapid-acting insulins, long-acting insulins, and incretin mimetics at contract pharmacies.

These announced policy changes were also similar in timing, where over four months, these policies prevented covered entities from turning to other competitors, in this case, the other Defendants. Notably, three of the four Defendants announced these changes within one month of each other—a timeframe similar to the one-month period that we deemed sufficiently parallel in *Starr*, 592 F.3d at 320. Defendants' reliance on their subsequent modifications to their new policies does not meaningfully alter our analysis. Specifically, the proposed second amended complaint asserts that following the initially announced changes: (1) in February 2021, Sanofi relayed an alteration to its claims-data policy, "limit[ing] its restrictions to . . . consolidated health center programs, disproportionate share hospitals, critical access hospitals, rural referral centers, and sole community hospitals," J. App'x 817; (2) in December 2021, Eli Lilly announced a policy similar to Sanofi's of allowing continued Section 340B Drug Discounts only if covered safety-net providers agreed to provide Eli Lilly claims

26

data associated with orders to community pharmacies, *id*.; and (3) in January 2022, Novo Nordisk announced that it would permit safety-net providers to designate two, rather than one, community pharmacy to which Section 340B Drug Discount products might ship, *id*. The timing of these restrictions remains similar enough to support an inference of parallel conduct.

The Defendants' policies also have a similar anti-competitive effect of limiting or eliminating the availability of Section 340B Drug Discounts. Plaintiffs allege that these restrictions by Defendants led to "the end of the overwhelming majority of Contract Pharmacy 340B Drug Discount sales to covered entities." *Id*. at 827. The district court erred when it determined that the Plaintiffs have not plausibly alleged that the "Defendants' disparate conduct ultimately achieved the same or a substantially similar end result." *See Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 714 F. Supp. 3d 209, 220 (W.D.N.Y. 2024). Aggregated data in the second amended complaint shows that these decimated Section 340B Drug Discounts happened in parallel, which significantly decreased the volume of Section 340B Drug Discount sales to contract pharmacies. Novo Nordisk's volume of drugs sold at Section 340B Drug Discount prices dropped by 70% the month of the new

policy, while the other Defendants' volumes dropped between 60–90% in similar periods. *See id. at* 217.

The exceptions each Defendant included in their announced policies were the biggest differences among the actions, but these differences are still consistent with parallel conduct. Sanofi offered an exception to providers willing to send valuable prescription-claims data to a Sanofi vendor. AstraZeneca permitted shipping to one community pharmacy but only for safety-net providers without an on-site dispensing pharmacy. Eli Lilly offered an exception to permit pharmacies to pass along certain insulin products at no cost, and Novo Nordisk created an exception for non-hospital entities. These exceptions do not make each Defendant's actions more disparate than the conduct found to be parallel in *Twombly*. Nor did the exceptions change the overall effect of restricting Section 340B Drugs.

The district court found that there was an "obvious alternate explanation for the facts underlying the alleged conspiracy: the failure of the Defendants' joint lobbying efforts." *Id*. at 222. But Defendants' alternate explanation is hardly "obvious." Even if it made "perfectly rational business sense for Defendants . . . to have independently reacted to the failure of [their] lobbying efforts" to limit

28

their participation in the 340B Drug Discount Program, *Mosaic Health*, 714 F. Supp. 3d at 222–23, that inference does not clearly negate the existence of a *conspiracy* for Defendants to do so. *Cf. N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp.*, 709 F.3d 109, 121 n.5 (2d Cir. 2013) ("[E]ven crediting the Defendants-Appellants' explanations, the [plaintiff's] inference of liability remains reasonable."). And as already explained, those same joint efforts actually support Plaintiffs' inferences by demonstrating a common means and motive for Defendants to conspire. Moreover, because Defendants' alternate explanation is not "obvious," the district court erred in requiring that Plaintiffs "disprove all nonconspiratorial explanations for the defendants' conduct." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) (quoting Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 14.03(b), at 14–25 (4th ed. 2011)). Indeed, "[a] court ruling on [a Rule 12(b)(6)] motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." *Anderson News I*, 680 F.3d at 185.

Therefore, Plaintiffs sufficiently alleged parallel conduct that contributes to an inference of a horizontal price-fixing conspiracy.

## B. Plaintiffs Sufficiently Plead the Plus Factors

We also require antitrust plaintiffs when relying on circumstantial evidence to supply allegations of "further circumstance pointing toward a meeting of the minds," sometimes called "plus factors." *Twombly*, 550 U.S. at 553, 557; *see also Anderson News II*, 899 F.3d at 104 (explaining that district courts must examine "defendants' conduct and communications . . . in context and with the 'overall picture' in mind"). "[P]lus factors may include: [1] a common motive to conspire, [2] evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and [3] evidence of a high level of interfirm communications." *Citigroup*, 709 F.3d at 136 (internal quotation marks omitted). As previously noted, we require plaintiffs at this stage to allege *a* plausible theory based on circumstantial evidence, not *the only* or even *the most* plausible one. *See Anderson News I*, 680 F.3d at 184.

Plaintiffs have alleged sufficient facts suggesting that Defendants had a common motive to conspire to neutralize or mitigate market-share and regulatory threats just before the restrictions were imposed. As direct competitors, these four Defendants control the diabetes drug marketplace, which would make concerted action amongst competing diabetes drug-markers imposing restrictions easy to coordinate and maintain. By jointly adopting a policy that largely denied covered

30

entities the ability to purchase Section 340B Drugs for delivery to contract pharmacies, Defendants effectively eliminated the vast majority of their Section 340B Drug Discount sales through those pharmacies—thereby increasing their profits and reducing competition over discounted pricing for key diabetes drugs.

Plaintiffs have also sufficiently alleged that restricting Section 340B Drug Discounts would have been against any individual Defendant's own economic self-interest. Plaintiffs alleged that restricting discounts alone would lead to decreased market share and regulatory sanctions that would risk loss of federal healthcare program coverage. Additionally, Plaintiffs allege that if a Defendant alone restricted discounts, its market share and sales volumes for rapid-acting analog insulins, long-acting analog insulins, and incretin mimetics would be threatened. As the second amended complaint suggests, covered entities service both Section 340B Drug Discount eligible patients and those who would not participate in the program, so Defendants would not be losing the market share for those latter patients unless they all acted together.

Plaintiffs' allegation that by acting collectively, Defendants limited their exposure only to civil monetary penalties, is plausible because, if one had acted alone, that Defendant would have been exposed to the greater risk of exclusion

31

from Medicare and Medicaid. Given the need for patients to have these drugs on the market, Defendants at the very least avoid being cut off from the market altogether by allegedly acting in concert. The district court did not credit Plaintiffs' allegation that there was "safety in numbers" in adopting the challenged policies that would risk market share by exposing Defendants to severe regulatory sanctions. *Mosaic Health*, 714 F. Supp. 3d at 224. Indeed, (i) the potential loss of market share if safety-net providers responded to discounts by changing their preferences to move their patients (Section 340B or otherwise) to competing manufacturers' firms drugs with discounts, and (ii) the potential devastating sanction of exclusion of the manufacturers' drugs from Medicare and Medicaid coverage serve as conceivable plus factors that weigh in favor of plausibility.

This inference of conspiracy is further supported by the alleged "high level of interfirm communications" among Defendants on the issue of Section 340B Drug Discounts. *See Apple*, 791 F.3d at 315 (internal quotation marks omitted). Plaintiffs assert that it is likely that Defendants communicated with each other both indirectly and directly through use of the same lobbying firms and lobbyists in advance of their restrictions on Section 340B Drug Discounts, making coordination even more probable. Moreover, they further assert that the same

lobbying firms worked on the Section 340B issue at the same time for PhRMA, an industry association of which each Defendant is a member and on the board of directors. According to Plaintiffs, the "Defendants, as PhRMA board members, communicated among themselves, and their most prominent advocacy issue was 340B Drug Discounts, including Contract Pharmacy 340B Drug Discounts." J. App'x 862. The district court failed to credit the inference that the Defendants' sharing of lobbying services and joint participation on the PhRMA board suggests that the Defendants had ample opportunity to conspire based on months of communications about Section 340B Drug Discount restrictions with the common aim of collusion. *See Mosaic Health*, 714 F. Supp. 3d at 224.

In sum, Plaintiffs have sufficiently alleged parallel conduct and plus factors that support the plausibility of a Section 1 conspiracy.

## III.    District Court Must Re-examine the State-Law Claims

The district court dismissed the state law antitrust and unjust enrichment claims for the same reason as it did Plaintiffs' Sherman Act claims. *Id.* at 225 ("[T]he proposed state law antitrust claims and the proposed state law unjust enrichment claims are premised on the allegation that Defendants have unlawfully conspired to overcharge Plaintiffs for their products . . . . As such, their proposed

33

amendments to their state law claims are futile."). In light of our conclusion that Plaintiffs have plausibly alleged that Defendants engaged in a horizontal price-fixing conspiracy, amendment would not be futile. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012) ("Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) . . . ."). Upon remand, the district court is directed to reexamine its ruling on Plaintiffs' allegations regarding state-law claims in a manner consistent with this opinion.

## CONCLUSION

This Court concludes that the proposed second amended complaint pleads sufficient facts to support a plausible inference of a horizontal price-fixing conspiracy through circumstantial allegations, where both (1) the conduct that Plaintiffs allege was sufficiently parallel, as the Defendants' announced policies were similar enough in substance, timing, and effect; and (2) Plaintiffs alleged sufficient circumstantial plus factors, including a common motive to conspire, parallel conduct contrary to the Defendants' individual economic self-interest, and a high level of interfirm communications.

We therefore **VACATE** the district court's judgment dismissing Plaintiffs'

34

suit and denying leave to amend and **REMAND** for the district court to grant

Plaintiffs leave to file their second amended complaint.